UNITED STATES DISTRICT COURT
For the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JASON HUNTER,<br><br>                Plaintiff,<br><br>vs.<br><br>YOUTHSTREAM MEDIA NETWORKS, INC.<br>NETWORK EVENT THEATER, INC., and<br>COMMON PLACES, LLC,<br><br>                Defendants. | Civil Action No.<br>01-CV-~~01606~~ MLW<br>*10659* |

## AMENDED VERIFIED COMPLAINT

### I.      Introduction

As and for an introduction to his complaint and the claims therein, plaintiff Jason Hunter states as follows:

1.    By this complaint the plaintiff, Jason Hunter ("Hunter"), seeks to enforce and/or recover damages for clear and blatant violations of two written contracts: one concerning the sale of Hunter's business and the other an employment contract that Hunter entered into simultaneously with the sale of that business.

2.    Under the first contract, Network Event Theater, Inc. ("NET") owes Hunter a periodic distribution of shares of common stock in NET in payment for shares, already transferred by Hunter to NET, of a corporation which Hunter founded. NET, having received the benefit of its bargain and having obtained Hunter's shares in his

corporation, is now in the process of dismantling the business of that corporation, and in bad faith, by means of false and fraudulent statements, and without colorable justification, it refused to distribute the shares for which Hunter has already paid and to which he is entitled. That refusal came at a time when the refusal would cause maximal harm to Hunter: the value of those shares on the open market was dropping, and also at a time when a proxy solicitation and a related corporate vote was imminent. Although, after this suit was filed and because of it, NET distributed Hunter's shares for the first quarter of 2001, NET has threatened that it will refuse distributions in the future. NET's bad faith is demonstrated, *inter alia*, by its reliance upon pretextual reasons for refusing to issue the stock to Hunter.

3.  Youthstream Media Networks, Inc. ("Youthstream") is named as a defendant concerning this claim against NET because, by virtue of mergers and acquisitions, NET has become a wholly owned subsidiary of Youthstream, because Youthstream, without thereby releasing NET from those obligations, has in practice and in fact assumed the obligations NET owes to Hunter (including issuing its own stock to Hunter instead of that of NET), because Youthstream personnel have been actively committing the violations and wrongful conduct which are the subject of this suit, and because, on information and belief, Youthstream has assumed the obligations and liabilities of NET towards Hunter as a matter of law.

4.  Hunter seeks declaratory relief to establish his rights to stock distributions. There is currently a live and justiciable controversy between the parties concerning whether Hunter's stock distributions are subject to being withheld on the basis of purported offsets concerning his employment contract. The obligations of NET and Youthstream

with respect to periodic quarterly stock distributions extend at least to December of the year 2002, and it is foreseeable that NET and Youthstream will continue to act in blatant and unexcused violation of their obligations. Injunctive relief is sought because in fact, and as a matter of law by the agreement of the parties under the written contract at issue, NET's and Youthstream's breach constituted and caused, and will constitute and cause, irreparable harm to Hunter.

5.  Under the second contract at issue, the employment agreement between Hunter and defendant Common Places, LLC ("CPLLC"), Hunter seeks as damages the amounts set forth in a written employment agreement, to be paid to him upon his termination by CPLLC without cause or upon his termination of employment for "Good Reason." He also seeks any other available damages resulting from the material and substantial changes in the conditions of his employment unilaterally and involuntarily imposed on him by CPLLC. Whether termination was by Hunter or by CPLLC, it occurred effective no later than April 24, 2001, and Hunter is now entitled to recover his damages for breach as a result of the actual breach by CPLLC and its substantially simultaneous anticipatory repudiation of the contract.

6.  Youthstream Media Networks, Inc. ("Youthstream") is properly named as a defendant concerning this claim because, by virtue of mergers and acquisitions, CPLLC has become a wholly owned subsidiary of Youthstream, Youthstream has, without thereby releasing CPLLC from those obligations, in practice and in fact assumed the obligations CPLLC owes to Hunter (including paying Hunter's salary directly), and Youthstream personnel have been committing the violations and wrongful conduct which are the

3

subject of this suit.  On information and belief, Youthstream has assumed the obligations and liabilities of CPLLC towards Hunter as a matter of law.

## II.   The Parties And Jurisdiction

7.  The plaintiff, Jason Hunter, ("Hunter") is a natural person residing in West Roxbury, Suffolk County, Massachusetts.

8.  The defendant Network Event Theater, Inc. ("NET") is a corporation organized under the law of Delaware, with a principal place of business in New York City, New York, and with a usual place of business in Cambridge, Middlesex County, Massachusetts.

9.  The defendant Youthstream Media Networks, Inc. ("Youthstream") is a corporation organized under the laws of Delaware, with a principal place of business in New York City, New York, and with a usual place of business in Cambridge, Middlesex County, Massachusetts.

10.  The defendant Common Places, LLC ("CPLLC"), is a limited liability company organized and existing under the laws of the State of Delaware and with a principal place of business in Cambridge, Middlesex County, Massachusetts.

11.  The Middlesex Superior Court from which this case was removed had subject-matter jurisdiction over this suit pursuant to Mass. Gen. Laws, c. 231A, c. 214 § 1; c. 212, § 4; and c. 93A, § 11.

12.  This Court has personal jurisdiction over the defendants by virtue of their presence in the Commonwealth of Massachusetts and by virtue of their transacting business in this Commonwealth. The claims set forth in this complaint arise out of that transaction of business.

13. Venue for this action was proper in the Middlesex Superior Court from which this case was removed pursuant to Mass. Gen. Laws, c. 223 §1 by virtue of the fact that at that time the plaintiff worked and resided in Middlesex County, Massachusetts and by virtue of the fact that the defendants have a place of business in this County and Commonwealth.

14. To the extent this Court has and retains subject matter jurisdiction pursuant to the defendants' removal, it has personal jurisdiction over the defendants for the reasons set forth in paragraph 12, above, and venue for the reasons set forth in paragraph 13.

### III. Facts Common To All Counts

15. On or about October 15, 1999, NET and Hunter, among others, entered into a written agreement of merger (the "Agreement") under which NET obtained all of the shares of stock in Invino Corporation ("Invino"), a corporation founded and owned in part by Hunter.

16. In exchange for his Invino stock, Hunter received a certain number of shares in NET, and the right to receive further shares of NET on a quarterly schedule as set forth in Schedule 1.7 to the Agreement. A true copy of that Schedule is attached hereto as Exhibit A.

17. Under Exhibit A, the number of shares Hunter was to receive each quarter was determined on the basis of a formula. Each quarter, the former Invino shareholders who were still owed stock by NET pursuant to the Agreement were to receive a number of shares of NET stock the value of which (determined based on an average of values

during a preceding period) equaled the shareholder's proportionate share of the quarterly distribution set forth in Schedule 1.7. Thus, for instance, for quarterly distributions on and after March 31, 2000, Hunter was entitled to receive NET stock worth (as determined under the contract) 47.28882% of the total quarterly distribution.

18. The quarterly distribution for March 31, 2001 was to be $375,000 and, as a result, Hunter was entitled to receive on or about that date stock of NET worth 47.28882% of $375,000, i.e., $177,333.08.

19. On information and belief, in or around the beginning of the year 2000, NET merged with and was the surviving corporation of a merger with, a wholly-owned subsidiary of Youthstream (hereinafter, the "NET Merger"), and itself became a wholly-owned subsidiary of Youthstream. Prior to the NET Merger, NET operated under the name "Youthstream Media Networks," as a d.b.a.

20. As a result of the NET Merger, Hunter received Youthstream stock in a one-for-one exchange for his NET stock.

21. From the time of the NET Merger until May 7, 2001 (i.e., after the original complaint in this action was filed), the stock of Youthstream was publicly traded under the ticker symbol formerly used for NET stock, i.e., NETS. Currently it is traded under the ticker symbol YSTM. On information and belief, Youthstream has since the NET Merger conducted all affairs of NET and its corporate legal department has handled the legal affairs of NET.

22. Further, on information and belief, Youthstream as a matter of law or fact assumed the liabilities and obligations of NET.

23. Youthstream, while in fact assuming the obligations of NET towards Hunter, has nevertheless refused to provide Hunter with specific information concerning the current legal and corporate structure of NET and Youthstream or the status of NET's and Youthstream's legal obligations towards Hunter. Instead, Youthstream has acted as if, and thereby led Hunter to believe that, it has stepped into the shoes of NET with respect to NET's obligations to Hunter.

24. After the NET Merger, Hunter's quarterly stock distributions in payment for his sale of his Invino stock took the form of stock in Youthstream.

25. Both Youthstream and NET failed and refused to make the quarterly stock distribution owed to Hunter on or about March 31, 2001.

26. When Hunter sold his stock in Invino under the Agreement, he also entered into a written employment contract with CPLLC (the "Employment Contract") calling for Hunter to be employed by CPLLC for a term of three years, subject to provisions for termination by Hunter and CPLLC. A true copy of the Employment Contract is attached hereto as Exhibit B.

27. As a part of the reorganization which included the NET Merger, Commonplaces, LLC also became wholly owned by Youthstream.

28. After the NET Merger, Youthstream acted as if it were Hunter's employer under the Employment Contract, and acted in all pertinent respects in the capacity of his employer under that Contract. After the NET Merger, Hunter's paychecks were issued by Youthstream, Hunter's options were exchanged for options in Youthstream, Hunter's business cards, stationary, etc., were printed with the title "Jason Hunter, Director Communication Services, Youthstream Media Networks." The sign in the lobby of the

building was replaced with a sign reading "Youthstream Media Networks." Significantly, NET but not CPLLC had operated under the name "Youthstream Media Networks" until the merger and acquisition by Youthstream. Thereafter, both NET and CPLLC were operated under the name "Youthstream Media Networks," which thereafter was also the corporate name of the parent organization, Youthstream.

29. On or about April 4, 2001, Youthstream falsely alleged that Hunter had violated his Employment Contract with NET and Youthstream, and asserted that it had withheld the stock due to Hunter as a quarterly distribution on the pretext that such withholding was an "offset" as against damages it claimed to have suffered.

30. The Agreement does not provide for such an offset and, in fact, Hunter's only obligation to NET under the Agreement with respect to his employment by CPLLC was to enter into the Employment Contract, which he did do.

31. Neither Youthstream nor NET have disclosed what damages they have allegedly suffered, or how those damages were calculated.

32. In fact, Hunter has not damaged Youthstream or NET in any way or, if he has (which he denies) there is no credible scenario under which those damages even approach the value of the stock to which Hunter is entitled.

33. Further, and equally dispositive, there is no provision of the Agreement or of Hunter's Employment Contract which permits either NET or Youthstream to withhold the stock to which Hunter is entitled, and for which he has already paid by the transfer of his Invino stock to NET.

34. The claims which Youthstream purports to set off against Hunter's stock had not been previously disclosed by Youthstream, are presently unquantified by Youthstream, and

are in fact false and fabricated.    Such a set-off of rights alleged to arise under the Employment Contract, and amounting only to monetary damages, against rights under the Agreement is precluded as a matter of law and equity by NET's agreement, binding on Youthstream, that a breach under the Agreement is subject to equitable injunctive relief and that such breach causes or constitutes irreparable harm.

35. The true reasons why Youthstream and NET are engaging in their blatantly unlawful conduct appear to relate to two factors, as set out in the following paragraphs.

36. On information and belief acquired by Hunter as a result of discussions within NET and Youthstream's Cambridge office and Hunter's own observations of layoffs and downsizing, NET and Youthstream are in the process of dismantling the business which Hunter and his fellow shareholders in Invino transferred to NET.  A consequence of this dismantling would be that NET and Youthstream do not have a continuing need for Hunter's employment for the entirety of the three year term under the Employment Contract.  Youthstream and NET therefore have a motive for forcing Hunter out of the affairs of NET and Youthstream, in violation of both the Agreement and the Employment Contract.

37. Furthermore, the terms and conditions of the NET Merger appear to have been designed to entrench in their positions the dominant shareholders, officers and directors of NET and Youthstream.  Hunter's entitlement to quarterly distributions of Youthstream stock pose a threat to that entrenchment.

38. NET's dominant shareholders, officers and directors face an even more serious threat to their entrenched position, however, because of the manner in which NET chose to pay Hunter over time for his Invino stock.  As is obvious from the formula set forth in the

agreement, the lower the value of Youthstream stock falls, the greater the number of Youthstream shares Hunter is entitled to receive quarterly.

39. In fact, the value of NET and Youthstream stock has fallen dramatically. According to a proxy solicitation filed with the Securities and Exchange Commission in connection with the NET Merger, at or around the time that Hunter sold his Invino stock and took NET stock in return (i.e., in June of 1999), NET stock was trading at prices in the teens, hitting highs of up to $22.00 per share, and averaging around $14.00 to $15.00 per share. Currently, however, Youthstream stock is trading in the $1.00-$1.50 per share range.

40. For Hunter to receive the fair consideration for which he sold his Invino stock, therefore, he must be given more than ten times as many shares in Youthstream than was anticipated at the time of the Agreement. This entitlement also threatens the entrenchment of the management of Youthstream and NET and provides a motive for the wrongful actions of Youthstream and NET because, were Hunter to receive all of the shares to which he is entitled at the current stock prices, he could become the single largest shareholder of the corporation.

41. Furthermore, on information and belief, the dominant and controlling shareholders, officers and directors of NET and Youthstream are concerned that any large-scale sell-off by Hunter could threaten the value of their stock, including lowering the price below the $1.00 per share level, resulting in its being de-listed from major stock exchanges, and they are therefore improperly attempting to control the market price by depriving Hunter of shares that could be sold in the open market so as to affect stock price. In other words, they are unfairly, artificially and fraudulently manipulating the value of Youthstream stock and, on information and belief, are committing a fraud on the market.

42. That Youthstream's management is prepared to so artificially control the price of Youthstream stock is also clear from another recent development. Youthstream has recently approved the set-aside of $2,000,000.00 for the purpose of buying Youthstream shares on the open market. Thus, management has positioned itself to prop up share prices by making strategic purchases when the price of Youthstream stock threatens to drop below the $1.00 per share mark.

43. Having assumed under the Agreement the risk that NET or Youthstream stock would become valueless -- a risk he still faces -- Hunter is entitled to the benefit of obtaining as many shares of NET or Youthstream stock as the Agreement's formula provides, along with the benefit of having the option of holding the stock in the hopes that that stock will eventually rebound in value. NET openly bargained for that result by offering a stock-for-stock swap based on a financial formula, and the refusal by Youthstream and NET to distribute stock and its threat to do so in the future are acts of bad faith, fraud and unfair dealing clearly intended to deprive Hunter of the earned value of the Agreement between the parties.

44. Because the refusal and threatened refusal by Youthstream and NET to make the quarterly distribution deprives Hunter of the unique opportunity to obtain shares in Youthstream or NET, to participate in its management and control, and to await the developments of the market, an award of damages will not adequately compensate Hunter for the wrongful behavior of Youthstream and NET. Furthermore, Hunter was denied and currently is being threatened with being denied the benefits of participation in the corporate affairs of Youthstream and NET. He is, therefore, suffering immediate and irreparable injury for which injunctive and other equitable relief is required.

11

COUNT ONE:  Injunctive Relief

45. Hunter incorporates herein by reference the averments of paragraphs one through forty-four set forth above, as if set forth in full herein.

46. NET and Youthstream agreed, pursuant to paragraph 10.1 of the Agreement "that irreparable damage would occur in the event any provision of this agreement were not performed in accordance with its specific terms or were otherwise breached."  Under this provision and otherwise, Hunter is entitled to equitable relief compelling Youthstream and NET to make the quarterly stock distributions described above.

WHEREFORE, Hunter requests that this honorable Court:

    A.  Issue a preliminary injunction prohibiting Youthstream and NET from distributing to any other person the stock to which Hunter is entitled under the Agreement, and compelling Youthstream and NET to make to Hunter the quarterly in-kind distributions of stock called for under Schedule 1.7 of the Agreement of October 15, 1999, in the form of stock in Youthstream until further order of the Court; and

    B.  After trial on the merits, issue a permanent injunction prohibiting Youthstream and NET from distributing to any other person the stock to which Hunter is entitled under the Agreement, and compelling Youthstream and NET to make to Hunter the quarterly in-kind distributions of stock called for under Schedule 1.7 of the Agreement of October 15, 1999, in the form of stock in Youthstream.

    C.  Award to Hunter such other and further relief as this Court deems just.

## COUNT TWO:  Declaratory Relief

47. Hunter incorporates herein by reference the averments of paragraphs one through forty-six set forth above, as if set forth in full herein.

48. There is an actual, live and justiciable controversy between Hunter on the one hand, and Youthstream and NET on the other, concerning Hunter's entitlement to his quarterly in-kind distributions under the Agreement and whether those quarterly distributions are subject to set-off for claims arising under the Employment Contract.

WHEREFORE, Hunter requests that this honorable Court declare the respective rights and obligations of the parties under the Agreement, and award Hunter such other and further relief as this Court deems just.

## COUNT THREE:  Breach of the Covenant of Good Faith and Fair Dealing

49. Hunter incorporates herein by reference the averments of paragraphs one through forty-eight set forth above, as if set forth in full herein.

50. The conduct of Youthstream and NET described above constitutes a breach of the covenant of good faith and fair dealing implied in every contract, and in this case implied in the Agreement.

51. The breach by Youthstream and NET of the covenant of good faith and fair dealing implied in the Agreement has caused damages to Hunter in an amount to be determined at trial.

WHEREFORE, Hunter demands that this honorable Court enter a judgment in his favor and against Youthstream and NET in an amount to be determined at trial, plus award him such other and further relief as this Court deems just.

### COUNT FOUR:  Unfair and Deceptive Acts and Practices

52. Hunter incorporates herein by reference the averments of paragraphs one through fifty-one set forth above, as if set forth in full herein.

53. Youthstream and NET at all times pertinent hereto were and are engaged in trade or commerce.

54. With respect to all transactions pertinent hereunder, Hunter was and is at all times pertinent hereto engaged in trade or commerce.

55. Hunter's claims as set forth in this complaint arise from the conduct of trade or commerce by him and by Youthstream and NET.

56. The wrongs described herein occurred and are occurring primarily and substantially in the Commonwealth of Massachusetts.

57. Youthstream and NET have employed a device, scheme or artifice to defraud, have attempted to obtain money or property by means of untrue statements or omissions of material fact, and have engaged in a transaction, practice or course of business which operates as a fraud or deceit upon a purchaser of securities, i.e., Hunter.

58. The wrongs described herein were and are unfair or deceptive, constituted unfair competition, or were otherwise in violation of law and the prohibitions of Massachusetts General Laws, chapter 93A, sections 2 and 11.

59. The wrongs described herein were and are being committed knowingly and willfully.

WHEREFORE, Hunter demands that this Court award him injunctive relief in accordance with the prayer set forth following Count One, that he be awarded his damages, that any such award of damages be trebled in accordance with Massachusetts General Laws, chapter 93A, section 11, that he be awarded his attorneys' fees incurred in enforcing his rights as against the unfair and deceptive acts and practices, unfair competition and/or other wrongful and prohibited conduct of Youthstream and NET, and that this Court award him such other and further relief as this Court deems just.

## COUNT FIVE:  Breach of Employment Contract

60. Hunter incorporates herein by reference the averments of paragraphs one through fifty-nine set forth above, as if set forth in full herein.

61. In and around the first quarter of 2001, Youthstream and CPLLC so materially changed the terms and conditions of Hunter's employment that Good Reason, as defined in the Employment Contract, existed for Hunter's termination of the Employment Contract. The material changes in conditions of employment included the termination of Hunter's staff so that he could no longer function as Director of development as called for by the Employment Contract, the sale of virtually all of the office equipment needed by Hunter

to serve his functions, and the arbitrary imposition of hours of employment and requisite "face time" which were inconsistent with Hunter's employment as an executive, and with the benefit of a written contract of employment for a term.

62. The existence of Good Reason for termination of the Employment Contract triggered Hunter's right to terminate the Employment Contract and to collect the salary to which Hunter would be entitled for the balance of the term of the employment contract, and with no duty on Hunter's part to mitigate his damages.

63. Hunter notified Youthstream and CPLLC of a material breach of his Employment Contract by a letter from counsel dated and transmitted on or about February 13th, 2001. A true copy thereof is attached hereto as Exhibit C.

64. Youthstream and CPLLC denied that Good Reason existed but, nonetheless, after receipt of that notice paid to Hunter a quarterly bonus required by the Employment Contract which previously it had failed to pay.

65. On April 4, 2001, Hunter, through counsel notified Youthstream of material changes in the conditions of Hunter's employment constituting Good Reason for Hunter's termination of the Employment Contract. A true copy of that letter is attached hereto as Exhibit D.

66. On April 4, 2001, Youthstream and CPLLC notified Hunter that they were treating him as in breach of his Employment Contract and that his employment would terminate effective on April 24, 2001. As alleged above, the assertions that Hunter was in breach of his employment contract were false and made in bad faith and without substantial legal or factual basis.

67. At that time, Youthstream and CPLLC were in actual breach the Employment Contract as a result of having failed to pay a quarterly bonus due to Hunter on or about March 31, 2001.

68. As of on or about April 4, 2001, Youthstream and CPLLC were in actual breach of the employment contract and had committed an anticipatory repudiation of the Employment Contract.

69. On April 23, 2001, Youthstream and CPLLC sought to rescind their termination of Hunter. As of that date, however, Hunter had changed his circumstances in reliance of his termination and, for this and other reasons, Youthstream and CPLLC were incapable of rescinding their termination of Hunter's employment.

70. The effort by Youthstream and CPLLC to rescind their termination of Hunter further demonstrated their bad faith. Having first suggested on April 4, 2001 that Hunter was disposable and could be terminated, and that his alleged breaches were not subject to cure, Youthstream and CPLLC on April 23, 2001 took the position that Hunter was indispensable to their business, and that any breaches had, in fact, been cured.

71. Youthstream's and CPLLC's termination of Hunter on April 4, 2001 effective April 24, 2001, was without cause. In the alternative, by the time that Youthstream and CPLCC attempted to rescind their without-cause termination of Hunter's Employment Contract, Hunter had already been entitled to, and had, terminated the Employment Contract for Good Cause.

72. As a consequence of Youthstream's and CPLLC's without-cause termination of Hunter on April 4, 2001 effective April 24, 2001, or, in the alternative, as a result of Hunter's "Good Reason" termination of the Employment Contract on and after April 23, 2001,

Hunter is entitled to continued payment of his salary for the balance of the three-year contract term.

73. As a result of the existence of Youthstream's and CPLLC's actual and anticipatory breaches as of on or about April 4, 2001, Hunter was entitled to accelerate his future payments under the Employment Contract and seek them in a present lump sum.

WHEREFORE, Hunter requests that this honorable Court declare that the Employment Contract was terminated by Youthstream and CPLLC without cause or, in the alternative, it was terminated by Hunter for Good Reason, and that because of the actual and anticipatory repudiation by Youthstream and CPLLC, Hunter is entitled to accelerate the balance of his Employment Salary; enter a judgment in his favor in the amount of the balance of his salary under the Employment Contract, award Hunter his costs and fees, plus award him such other and further relief as this Court deems just.

JASON HUNTER,
By his attorneys,

_____
Nelson P. Lovins, BBO # 306020
Paul M. Rezendes, BBO # 417850
Lovins & Metcalf
Ten Cedar Street
Chestnut Green
Woburn, MA 01801
(781)938-8800
fax: (781)938-8800

Dated: 6-26-01

VERIFICATION

I, Jason Hunter, have read the foregoing complaint. The factual statements therein are true and, as to the statements made on information and belief, they are true to the best of my knowledge and belief. The foregoing is signed under the pains and penalties of perjury.

_____
Jason Hunter

Dated: October 4, 2001

*facts were true as of May 11, 2001*

19

VERIFICATION

I, Jason Hunter, have read the foregoing complaint.  The factual statements therein are true and, as to the statements made on information and belief, they are true to the best of my knowledge and belief.  The foregoing is signed under the pains and penalties of perjury.

_____

Jason Hunter

Dated:  October __, 2001

I certify that on   9-28-01
I served this document on the
following person, by mail, by hand,
pursuant to Rule 5 of the
Federal Rules of Civil Procedure

_____

To: Alicia Downey, Esq.
Mary Cohn, Esq.

19

# EXHIBIT A

*FINAL VERSION 10/14/99*

Schedule 1.7

Exchange of Certificates Representing NET Common Stock

(a)

| Shareholder | % Ownership of Invino immediately prior to | # of shares of NET Common Stock (See |
|---|---|---|
| Jason Hunter | 38.81667% | 47,270 |
| Malay Kundu | 37.29445% | 45,416 |
| Khudari | 5.08574% | 19,151 |
| Gore Creek Trust | 5.08574% | 19,151 |
| Alan Docter | 5.08574% | 19,151 |
| Bill O'Connell | 1.38028% | 5,197 |
| Daniel Grunberg | 1.25279% | 4,717 |
| Bill Tyler | 5.55554% | 6,765 |
| Carol Rapp | 0.02546% | 31 |
| Phillip (Chet) Hooker | 0.18194% | 222 |
| Donna Griffiths | 0.23564% | 287 |
| Total | 100.00000% | 167,358 |

NOTE: These share numbers are calculated based on the NET Average Price as defined in Section 1.6(e) of $23.901.

IIWD2 721167v1
4622/75022-050  NYLIB2/670896 v3

FINAL VERSION 10/14/99

Schedule 1.7 (continued)

Exchange of Certificates Representing NET Common Stock

(b)

| Qtr Ending | $'s for 12/31/99 Distribution | Jason Hunter | Malay Kundu | Tyler | Rapp | Hooker | Griffiths | Total |
|---|---|---|---|---|---|---|---|---|
| % for 12/31/99 Distribution | | 47.14220% | 45.29148% | 6.74711% | 0.31006% | 0.22097% | 0.28618% | 100.00000% |
| 12/31/99 | $ 500,000.00 | $ 235,710.98 | $ 226,467.41 | $ 33,735.56 | $ 1,550.31 | $ 1,104.84 | $ 1,430.90 | $ 500,000.00 |
| % for all Post 12/31/99 Distributions | | 47.28882% | 45.43436% | 6.76810% | 0.00000% | 0.22165% | 0.28707% | 100.00000% |
| 3/31/00 | $ 500,000.00 | $ 236,444.10 | $ 227,171.79 | $ 33,840.48 | $ - | $ 1,108.27 | $ 1,435.35 | $ 500,000.00 |
| 6/30/00 | $ 500,000.00 | $ 236,444.10 | $ 227,171.79 | $ 33,840.48 | $ - | $ 1,108.27 | $ 1,435.35 | $ 500,000.00 |
| 9/30/00 | $ 500,000.00 | $ 236,444.10 | $ 227,171.79 | $ 33,840.48 | $ - | $ 1,108.27 | $ 1,435.35 | $ 500,000.00 |
| 12/31/00 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 3/31/01 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 6/30/01 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 9/30/01 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 3/31/02 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 6/30/02 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 9/30/02 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| 12/31/02 | $ 375,000.00 | $ 177,333.08 | $ 170,378.84 | $ 25,380.36 | $ - | $ 831.21 | $ 1,076.52 | $ 375,000.00 |
| Total | $ 5,000,000.00 | $ 2,363,707.91 | $ 2,271,013.48 | $ 338,299.90 | $ 1,550.31 | $ 11,079.30 | $ 14,349.10 | $ 5,000,000.00 |

NOTE:  Calculation Formula for Number of Shares of NET Common Stock to be issued to each of the shareholders listed in 1.7 (b) above is as follows:

# of Shares of NET Common Stock per individual = Pro-rata Percentage of Distribution Payment times the Total Quarterly Distribution Payment for such Quarterly Closing Date divided by the NETS Average Price as defined in 1.6(c).i).

IIWD2 721167v1

4622/75022-050 NYLIB2/670896 v3

# EXHIBIT B

# EMPLOYMENT AGREEMENT

## Dated October 15, 1999

The parties to this agreement are Jason Hunter, residing at 169 Monsignor O'Brien Highway, Apt. #204, Cambridge, Massachusetts 02141 (the "Executive"), and Common Places, LLC, a Delaware limited liability company with its principal office at c/o Network Event Theater, Inc. 529 Fifth Avenue, 7th Floor, New York, New York 10017 (the "Company").

The Company wishes to secure the services of the Executive, and the Executive has agreed to serve the Company, on the terms set forth in this agreement.

It is therefore agreed as follows:

1. Employment.  During the term of the Executive's employment under this agreement, the Company shall employ the Executive, and the Executive shall serve the Company, as Director of Communications Services.  The Executive shall report to Mark Palmer, Chief Technical Officer, and shall perform the duties and responsibilities set forth on schedule 1 and such other duties as are assigned to him from time to time by the Chief Technical Officer that are not inconsistent with his duties as Director of Communications Services, as set forth on schedule 1. The Executive shall devote substantially all his business time to the performance of his duties under this agreement.

2. Term of Employment.  The term of the Executive's employment under this agreement shall commence on the date of this agreement and, subject to earlier termination upon the Executive's death or disability pursuant to section 5.1 or pursuant to section 6, shall continue until the third anniversary of the date of this agreement.

3. Compensation.  As cash consideration for his services under this agreement, the Executive shall be entitled to a salary at the rate of $105,000 a year, payable in equal installments in accordance with the Company's customary payroll practices for its employees.  In addition, the Executive shall be entitled to an annual bonus of $20,000, payable not less frequently than quarterly, subject to the Executive fulfilling obligations that he and the Company mutually agree upon from time to time.  Following the end of each fiscal year during the term, the Company's board of directors may increase (but not decrease) the Executive's salary or grant the Executive additional bonuses based on his performance during that year.

4. Reimbursement of Expenses; Fringe Benefits.

4.1 Expenses. The Company shall reimburse the Executive for all reasonable expenses incurred by the Executive in connection with the performance of his duties, upon presentation of appropriate vouchers covering the expenses.

4.2 Fringe Benefits. The Executive (and his immediate family) shall be entitled to participate in medical, dental, disability, life insurance and other fringe benefits and executive perquisites at the same levels as comparable employees of the Company.

4.3 Option. Upon execution and delivery of this agreement, the Company is granting the Executive options to purchase common units in the Company pursuant to the Company's 1999 Unit Plan in accordance with a letter agreement dated the date of this agreement among the parties to the letter agreement.

5. Disability or Death.

5.1 Disability. If, as the result of any physical or mental disability, the Executive shall fail or be unable to perform his duties for a total of 180 days in any 12-month period, the Company may, by notice to the Executive, terminate his employment under this agreement as of the date of the notice.

5.2 Payments on Disability. If the Executive's employment is terminated pursuant to section 5.1, the Executive shall be paid, in full discharge of all the Company's obligations to the Executive, the Executive's full salary and accrued bonus, if any, under section 3, and his fringe benefits under section 4, for one month following the date of termination (or, if a shorter period, the remainder of the term), less the amount of any disability payments received by him under any disability insurance coverage provided to him by the Company. If the Executive shall request, the Company shall, at the Executive's expense, keep the Executive and his immediate family on all medical, dental and other plans they previously enjoyed under this agreement for the minimum period required under applicable law.

5.3 Payments on Death. The Executive's employment under this agreement shall be terminated upon his death and the Executive's estate shall be paid, in full discharge of all the Company's obligations to the Executive, the Executive's full salary and accrued bonus, if any, under section 3 for three months following the date of termination (or, if a shorter period, the remainder of the term), plus the proceeds of any life insurance policy purchased by the Company on the Executive's life and payable to the Executive's heirs and estate. If the Executive's immediate family shall request, the Company shall, at the expense of the Executive's immediate family, keep them on all medical, dental and other plans they previously enjoyed under this agreement for the minimum period required under applicable law.

6. Termination.

6.1. Payments Upon Termination for Cause or Voluntary Resignation. The Company may terminate the Executive's employment under this agreement for cause (as defined in section 6.3). If the Executive's employment under this agreement is terminated for cause pursuant to section 6.1 or by the Executive's voluntary resignation (other than for Good Reason, as defined in section 6.3), the Company shall pay the Executive, in full discharge of its obligations to the Executive under this agreement, the accrued amount of the salary and accrued bonus, if any, and benefits due to him through the date of termination and the amount of all expense reimbursements due for periods prior to termination.

6.2. Payments Upon Termination for Other Reasons. If the Executive's employment under this agreement is terminated by the Company for any reason other than for cause pursuant to section 6.1 or death or disability pursuant to section 5, or if the Executive's employment under this agreement is terminated by the Executive for Good Reason, the Company shall pay the Executive (a) to the extent not previously paid (and not subject to proration, offsets or claims of any kind), if, as and when otherwise payable, all salary payable pursuant to section 3 through the remainder of the term, and (b) to the extent not previously paid (and not subject to proration, offsets or claims of any kind), all bonuses, if any, previously authorized by the Company's board of directors. In addition, upon the request of the Executive, the Company shall, at the Executive's expense, keep the Executive and his immediate family on all medical, dental and other plans they have enjoyed under this agreement through the minimum period required under applicable law. None of the payments provided for in this section 6.2 shall be reduced by any amounts earned or received by the Executive from any third party at any time. Without limiting the generality of the foregoing, in the case of any termination of employment for any reason other than pursuant to section 6.1, there shall be no requirement on the part of the Executive to mitigate damages.

6.3   Definitions. As used in this agreement:

(a) the term "cause" shall be limited to mean: (i) the conviction of the Executive of a felony, (ii) the conviction of the Executive for a crime involving any financial impropriety or moral turpitude or that would materially interfere with the Executive's ability to perform his services required under this agreement or otherwise be materially injurious to the Company, (iii) the use of alcohol or drugs by the Executive to an extent that materially interferes with the Executive's ability to perform his services required under this agreement or otherwise is materially injurious to the Company or (iv) the willful and knowing breach by the Executive in a material respect of his obligations under this agreement after 20 days notice and an opportunity to cure and after a hearing before the board with the Executive's counsel permitted to be present at such hearing; and

(b) the term "Good Reason" shall be limited to mean the occurrence, without the express written consent of the Executive, of any of the following circumstances: (i) a significant adverse alteration in the Executive's status in the Company, in the nature of the Executive's responsibilities or in the material conditions of the Executive's employment; (ii) a

reduction by the Company in the Executive's annual basic salary or benefits as provided for in this agreement; (iii) the Company requiring that the Executive be based at a location more than 100 miles from his residence on the date of this agreement, except for required travel on the Company's business; and (iv) the Company's breach of any of its material obligations under this agreement and the continuation of that breach for 20 days after written notice by the Executive to the Company.

7. <u>Confidential Information</u>. The Executive shall not, directly or indirectly, either during his employment by the Company or at any time thereafter, disclose to anyone or use (except as authorized in the regular course of the Company's business) any information acquired by him during his employment with respect to any of the Company's trade secrets or other confidential information (it being understood, however, that nothing in this agreement shall be deemed to prohibit the Executive from disclosing such information as he is required to disclose in response to a court order or other legal process, and, in any such case, he shall afford the Company as much opportunity as practicable to intervene in order to limit the information required to be disclosed or subject to a protective order any information so disclosed). For this purpose, information that is either generally known to the public or that is not used, developed or obtained in connection with the Company's actual or anticipated business shall not be considered a trade secret or confidential information.

8. <u>Non-Competition, etc</u>

8.1 <u>Non-Competition</u>. The Executive shall not, during the Applicable Restricted Period (as defined below), except through the Company or any of its affiliates, directly or indirectly, engage or be interested in (a) the business of developing or operating an Internet portal or hub targeted primarily to individuals between the ages of 16 and 25, (b) the business of developing or operating an instant messaging system, either text or voice based, (c) any business directly competitive with any business the Company or any of its affiliates is engaged in at the time of his termination of employment and in which he was directly, materially involved during his employment (it being understood and agreed that the Company and its affiliates shall not be deemed to have been engaged, at the time of his termination of employment, in any Abandoned Business (as defined below) or any New Market Business (as defined below)) or (d) any business directly competitive with a business developed from a project in which he was directly, materially involved during his employment (it being understood and agreed that the Company and its affiliates shall not be deemed to have been engaged, at the time of his termination of employment, in any Abandoned Business or any New Market Business) (any such business referred to in (a), (b), (c) or (d), a "Restricted Business"); provided, however, that nothing in this paragraph shall limit the right of any such individual to be employed by a media or Internet company whose businesses include a Restricted Business, as long as he does not provide any services to that Restricted Business. For this purpose, a person shall be deemed to be directly or indirectly engaged or interested in a business or entity, if he is engaged or interested in that business or entity as a stockholder, member, partner, individual proprietor, director, officer, employee, agent, lender, consultant or otherwise, but not if his interest is limited solely to the ownership of 5% or less of any class of the equity or debt securities of a corporation as to which he has only a passive role. As used in this agreement, (I) the term "Applicable Restricted Period" means (y) the period during which the Executive is an employee of the Company or any of its affiliates, and (z) the period beginning immediately thereafter and

terminating (i) 24 months later, in the case of (a) above, (ii) 36 months later, in the case of (b) above, and (iii) 18 months later, in the case of (c) and (d) above, (II) the term "Abandoned Business means any business in which the Company and all its affiliates shall have ceased to engage, other than as a result of a sale, transfer or other disposition thereof to a third party, and (III) the term "New Market Business" means a business that does not, and is not foreseeably intended to, penetrate a particular market in which the Company or any of its affiliates engage or a market to which a particular market in which the Company or any of its affiliates engage would foreseeably be expected to extend.

8.2     Non-Solicitation.     The Executive shall not, as long as he is an employee of the Company or any of its affiliates and for a period of 18 months thereafter, directly or indirectly, solicit for employment or hire any person who, during the 12-month period preceding the date of solicitation or hiring, was an employee of the Company or any of its affiliates.

8.3     Injunction.     The Executive acknowledges that the remedy at law for the breach of the provisions of section 8.1 or 8.2 would be inadequate and that, in addition to any other remedy the Company may have, it shall be entitled to an injunction restraining any such breach or threatened breach, without bond or other security being required and without the necessity of showing actual damages or economic loss.

8.4     Governing Law.     Notwithstanding the provisions of section 9.6, this section 8 shall be governed by New York law; provided, however, if this section 8.4 is, for any reason unenforceable, this section 8.4 shall be governed by section 9.6.

9. Miscellaneous.

9.1.  Headings.  The section headings of this agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this agreement.

9.2.  Notices.  All notices and other communications under this agreement shall be in writing and shall be deemed given when delivered personally or mailed by registered mail, return receipt requested, to the parties at their respective addresses set forth above (or to such other address as a party may have specified by notice given to the other party pursuant to this provision) with a copy, in the case of any notice to the Executive, to:

> Michele A. Whitham, Esq.
> Foley, Hoag & Eliot
> One Post Office Square
> Boston, MA  02109

9.3.  Separability.  The invalidity or unenforceability of any provision of this agreement shall not affect the validity or enforceability of any other provision of this agreement, which shall remain in full force and effect.

9.4. <u>Waiver</u>. Either party may waive compliance by the other party with any provision of this agreement. The failure of a party to insist on strict adherence to any term of this agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this agreement. No waiver of any provision shall be construed as a waiver of any other provision. Any waiver must be in writing.

9.5. <u>Assignment</u>. Neither party may assign any of its rights or delegate any of its duties under this agreement (other than as contemplated by this agreement) without the prior consent of the other and any assignment or delegation in violation of this prohibition shall be void. This agreement shall be binding upon and inure solely to the benefit of each party to this agreement and its respective successors, executors, administrators, heirs and permitted assigns, including, with respect to the Company, the survivor of the Mergers (as defined in the agreement and plan of merger dated June 28, 1999 among Network Event Theater, Inc., the Company, YouthStream Media Networks, Inc., Nunet, Inc., Nucommon, Inc. and certain individuals).

9.6. <u>Governing Law</u>. This agreement shall be governed by and in accordance with the substantive law of the Commonwealth of Massachusetts applicable to agreements made and to be performed in Massachusetts, without giving effect to the conflict of laws principles of such Commonwealth.

9.7. <u>Entire Agreement</u>. This agreement contains, and is intended as, a complete statement of all the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreements and understandings between the parties with respect to those matters and cannot be changed or terminated orally.

9.8 <u>Counterparts</u>. This agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement.

COMMON PLACES, LLC

By:

Jason Hunter                    10-14-99

4822/75022-050 NYLIB2/666292 v3                    6                    10/14/99  08:40 PM  (16300)

9.4.  Waiver.  Either party may waive compliance by the other party with any provision of this agreement.  The failure of a party to insist on strict adherence to any term of this agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this agreement. No waiver of any provision shall be construed as a waiver of any other provision.  Any waiver must be in writing.

9.5.  Assignment.  Neither party may assign any of its rights or delegate any of its duties under this agreement (other than as contemplated by this agreement) without the prior consent of the other and any assignment or delegation in violation of this prohibition shall be void. This agreement shall be binding upon and inure solely to the benefit of each party to this agreement and its respective successors, executors, administrators, heirs and permitted assigns, including, with respect to the Company, the survivor of the Mergers (as defined in the agreement and plan of merger dated June 28, 1999 among Network Event Theater, Inc., the Company, YouthStream Media Networks, Inc., Nunet, Inc., Nucommon, Inc. and certain individuals).

9.6.  Governing Law.  This agreement shall be governed by and in accordance with the substantive law of the Commonwealth of Massachusetts applicable to agreements made and to be performed in Massachusetts, without giving effect to the conflict of laws principles of such Commonwealth.

9.7.  Entire Agreement.  This agreement contains, and is intended as, a complete statement of all the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreements and understandings between the parties with respect to those matters and cannot be changed or terminated orally.

9.8  Counterparts.  This agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement.

COMMON PLACES, LLC

By: _____
       CFO

_____
Jason Hunter

Schedule 1

Director of Communications Services:  Jason Hunter

1. Leading the future architecture and development of the Invino Instant Messaging Service.

2. Hiring and building the Communications Services engineering team.

3. Leading the Communications Services division in the architecture and development of YouthStream's communications services.

**EXHIBIT C**

# LOVINS & METCALF

Attorneys At Law          Chestnut Green · Ten Cedar Street · Woburn · Massachusetts · 01801

|  |  |
|---|---|
|  | (781) 938-8800 |
|  | (888) 656-8467 |
| FAX | (781) 938-4753 |
| E-MAIL | NLOVINS @ aol. com |
| WEB SITE | www.lovinslaw.com |

February 13, 2001

*Via Certified Mail*
*Return Receipt Requested No:  7099 3400 0015 2627 6818*

James Lucchesi
President and CEO
YouthStream Media Networks, Inc.
c/o Sodalus
810 Memorial Drive
Level M
Cambridge, MA  02139

             RE:   Jason Hunter

Dear Mr. Lucchesi:

        Please be advised that this law firm represents Mr. Jason Hunter. As you know Mr. Hunter is an employee of YouthStream by virtue of that certain Employment Agreement dated October 15, 1999 by and between Mr. Hunter and entity known as Commonplace, LLC.  That Employment Agreement was executed in connection with the Agreement and Plan of Merger among Network Event Theater, Inc., New Invino, Inc., Invino Corporation and all the Stockholders of Invino Corporation dated October 15, 1999.  Mr. Hunter serves in the capacity of Director of Communication Services for YouthStream.

        Your attention is drawn to Sections 3, 6.2 and 6.3(b) of that Employment Agreement. Despite Mr. Hunter having achieved his performance obligations under Section 3, Mr. Kenley has advised my client that he would not be receiving his second quarter bonus pursuant to your direction that "no bonuses would be paid until YouthStream became profitable." Just two weeks prior to that, when Mr. Hunter inquired of his second quarter bonus, he was advised by Mr. Kenley not only that he had met his performance obligations, but also that he was entitled to the bonus and that Mr. Kenley would put a rush on the matter.

# LOVINS & METCALF

Mr. James Lucchesi
February 13, 2001
Page 2

YouthStream's failure to have paid Mr. Hunter his bonus justifies a termination under Sections 6.3(b) (ii) and 6.3(b) (iv).  Assuming that Mr. Hunter is paid through the end of February, he will be entitled to $183,000.00 in salary (as adjusted from $105,000.00 to $110,000.00 per annum), $5,000.00 in bonus money for the second quarter and a portion of this third quarter bonus.

YouthStream may make its payments through this office or directly to Mr. Hunter. In any event, all further communications on this matter should be directed to this office.

Very truly yours,

Nelson P. Lovins

NPL/js

cc:     Greg Kenley (via certified mail)  7099 3400 0015 2627 6801

**EXHIBIT D**

# LOVINS & METCALF

Attorneys At Law     Chestnut Green · Ten Cedar Street · Woburn · Massachusetts · 01801

|  | |
|---|---|
| | (781) 938-8800 |
| | (888) 656-8467 |
| FAX | (781) 938-4753 |
| E-MAIL | NLOVINS @ aol. com |
| WEB SITE | www.lovinslaw.com |

April 4, 2001

*Via Certified Mail 7099 3400 0004 5720 5201*

Mr. James Lucchesi
President and CEO
YouthStream Media Networks, Inc.
28 West 23rd Street
6th Floor
New York, NY 10010

Re:    Jason Hunter

Dear Mr. Lucchesi:

As you know, this law firm represents Mr. Jason Hunter, an employee of
YouthStream by virtue of that certain Employment Agreement dated October 15, 1999
previously referenced in my February 13, 2001 letter to you. Mr. Hunter serves in the
capacity of Director of Communication Services for YouthStream and his job description
appears on Schedule 1 attached to his Employment Agreement. I am advised that
recently YouthStream has fired all of my client's staff and announced that it has no
interest in future development of software and that its only function will be to sell off
Sodalis' assets.

These actions and expressions of YouthStream's intent are inconsistent with Mr.
Hunter's job description. He was hired as a Director; however, without any staff he
obviously cannot lead "the future architecture and development of the Invino Instant
Messaging Service"; nor can he hire and build the Communications Services Engineering
Team or lead the Division "in the architecture and development of YouthStream's
Communication Services", as there is no such team to develop and YouthStream has
announced that it intends to shut down Mr. Hunter's division by June 30th.

Furthermore, Mr. Hunter's third quarter bonus of $5,000.00 has not been paid.

# LOVINS & METCALF

Mr. James Lucchesi
April 4, 2001
Page 2


Accordingly, YouthStream is in breach of Mr. Hunter's contract under 6.3(b)(i), (ii) and (iv).  Under the balance of his contract, he is currently owed $174,600.00 plus $5,000.00 for his third quarter bonus plus $6,300.00.

Please make these payments forthwith through this office or directly to Mr. Hunter.  In any event, all further communications on this matter should be directed to this office.

Very truly yours,

Nelson P. Lovins

NPL/js
Attachment

cc:    Thea Winarsky, Vice President and General Counsel
       28 West 23rd Street
       6th Floor
       New York, NY  10010